# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**SARAH SANDERS** and **JO SANDERS**,

      Plaintiffs,

  v.

**SWS HILLTOP, LLC,** an Oregon Limited Liability Company; and **WILLIAM SEIDL,** an individual,

      Defendants.

No. 6:17-cv-00256-MC

**OPINION AND ORDER**

**MCSHANE, Judge**:

      Plaintiffs, Sarah Sanders and Jo Sanders, bring this housing discrimination action against SWS Hilltop, LLC and William Seidl. In 2016, Jo Sanders moved to Lincoln City, Oregon with her daughter, Sarah Sanders, and 4-year-old granddaughter. While living out of a hotel room, Plaintiffs inquired about a vacancy at Defendants' Hilltop Apartments complex. Their application indicated that Jo Sanders owned a service dog. Despite qualifying for the apartment, Defendants discouraged Plaintiffs from pursuing a lease agreement, demanding an inflated deposit and refusing to install clean carpeting. Plaintiffs re-inquired about the apartment one week later, this time without the dog, but received no response from Defendants. After remaining homeless for two months, Plaintiffs filed the instant suit, alleging disability discrimination under both state and federal fair housing law. The parties now move for summary judgment. Because no rational trier of fact could find that Defendants' actions were primarily motivated by anything other than discriminatory intent, Plaintiffs' motion is GRANTED.[1]

---

[1] The parties' requests for oral argument are denied as unnecessary.

Page 1 – OPINION AND ORDER

# BACKGROUND

On February 27, 2016, Jo Sanders moved to Lincoln City, Oregon with her daughter, Sarah Sanders, and 4-year-old granddaughter. Sanders Dep. 138:12-23. When Plaintiffs arrived, they lacked permanent housing and were living out of a hotel room. Sanders Dep. 138:12-23. On March 5, as part of their effort to secure permanent housing, Sarah Sanders called Hilltop Apartments to inquire about a vacant unit. Suckow Dep. 41:9-16. She spoke with Krisitin Suckow,[2] the property manager for the apartment complex, and was encouraged to apply for the unit. Suckow Dep. 9:11-15, 41:9-16; Seidl Dep. 9:24-10:1.

On March 11, Sarah Sanders completed and submitted an online application. Ellis Decl., Ex. 11 at 3-4. The application represented that Jo Sanders owned a "VA registered service animal" which was "trained with documentation." Ellis Decl., Ex. 11 at 4. Jo Sanders suffers from diabetes, congestive heart failure, high blood pressure, vision impairment, and has difficulty walking and balancing. Sanders Dep. 88:15-19. She previously owned a dog, River, which she trained to detect changes in her insulin levels and assist with her balance. Sanders Dep. 26:18-21; Sanders Dep. 92:17-20. At the time of her application, Jo Sanders owned a puppy, Winston, which was undergoing basic obedience training. Sanders Dep. 25:22-26:15. She intended to train Winston in substantially the same manner as River. Sanders Dep. 26:8-20.

When Ms. Suckow received Plaintiffs' application, she contacted William Seidl. Suckow Decl. 1. Mr. Seidl is a member and the manager of SWS Hilltop, LLC, the entity which owns Hilltop Apartments. Seidl Dep. 9:15-23. Despite the apartment complex's policy of allowing animals in their units, Mr. Seidl stated that he was "[n]ot super excited about a 50 pound (probably larger) dog on new carpet" and noted that Plaintiffs were "pretty tight on income,"

---

[2] Plaintiffs sometimes refer to Kristin Suckow as "Khrys Suckow." *See, e.g.*, Pls.' Br. 3. Ms. Suckow signed her sworn declaration as "Kristin Suckow," so the Court refers to her as such. Suckow Decl. 4.

suggesting a $1200 deposit. Ellis Decl., Ex. 11 at 3. After Ms. Suckow responded that Defendants could not seek a deposit for service animals, Mr. Seidl repeated that he did not want to replace the "old and warn out carpet . . . since [Jo Sanders] has a large service animal." Ellis Decl., Ex. 11 at 2. "Hopefully she'll change her mind," he continued, and instructed Ms. Suckow not to contact Plaintiffs: "Lets [sic] make it tough . . . ." Ellis Decl., Ex. 11 at 2.

On March 15, Sarah Sanders called Ms. Suckow to follow up. According to Ms. Suckow, she requested a second application fee in accordance with Defendants' policy and repeated the following scripted remarks provided by Mr. Seidl: "[T]he owner hasn't yet decided about your application. Your income barely meets our financial approval limits and the carpet is old and worn out in that unit, and the owner doesn't want to replace it and then put an animal on it. So you're going to have a really high deposit and old carpet." Ellis Decl., Ex. 11 at 2; Suckow Decl. 1. A few days earlier, the carpet had been described by one employee as "FILTHY, NASTY, . . . PUKE." Ellis Decl., Ex. 8 at 1 (capitalization in original). Sarah Sanders maintains that, although Ms. Suckow related the carpet's condition and noted the missing application fee, she also "stated there was no point [to paying the second fee] because the owner was not going to rent to us." Sanders Dep. 158:4-16.

Plaintiffs inquired once more about the apartment on March 17, this time after giving away Winston. Ellis Decl., Ex 11 at 1; Sanders Dep. 172:12-19. When Ms. Suckow informed Mr. Seidl that Plaintiffs had given away their dog and wished to be reconsidered, he instructed her not to return their call, stating that "they'll just move the dog in later and we won't be able to stop them." Ellis Decl., Ex. 11 at 1. "Let's be picky," he continued, "[w]e're coming into the time of the month when responsible people are looking." Ellis Decl., Ex. 11 at 1. Although the parties disagree as to whether they ever discussed Plaintiffs formally withdrawing their

Page 3 – OPINION AND ORDER

application, *compare* Seidl Decl. 2, *with* Sanders Dep. 166:12-20, they agree that Defendants issued a refund shortly before the second inquiry and despite Plaintiffs having offered to submit a second application fee. Ellis Decl., Ex. 11 at 1-2.

On April 4, Jo Sanders, now living out of her car with Sarah Sanders and her granddaughter, called Ms. Suckow to determine why Plaintiffs' application had been denied. Sanders Dep. 172:12-17. Ms. Suckow asked her to submit the request in writing, which she did that afternoon. Ellis Decl., Ex. 12 at 1. Defendants never responded. Suckow Dep. 72:1-9. Shortly thereafter, and after remaining empty for nearly two weeks, Defendants leased the unit to another applicant, Kelly Bay. Ellis Decl., Ex. 13 at 1. Although Ms. Bay reported a lower income than Plaintiffs, she did not own a dog and indicated no plans to acquire one. Seidl Dep. 66:10-21. Three months after starting her lease, Ms. Bay signed a Pet Agreement so that her brother, who visited "on [an] occasional basis," could bring his dog. Ellis Decl., Ex. 13 at 2.

On February 15, 2017, Plaintiffs initiated the present action, alleging disability discrimination under both state and federal fair housing law. After completing discovery, the parties filed cross-motions for summary judgment. The matter is now before this Court. Because no rational trier of fact could conclude that Defendants' actions were primarily motivated by anything other than discriminatory intent, Plaintiffs' Motion for Summary Judgment is GRANTED. Defendants' Motion for Summary Judgment is DENIED.

## STANDARDS

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the case and an issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v.*

*Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the movant carries its burden, however, then the non-movant must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (citation omitted). The "mere existence of a scintilla of evidence in support of the plaintiff's position," *Anderson*, 477 U.S. at 255, as well as uncorroborated allegations and "self-serving testimony," *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002), are insufficient to avoid summary judgment.

## DISCUSSION

The federal Fair Housing Act ("FHA") makes it unlawful to, *inter alia*, "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling" because of a renter or associated person's disability.[3] 42 U.S.C. § 3604(f)(1). Under the FHA, discrimination claims are analyzed in the same manner as claims under Title VII of the Civil Rights Act, which prohibits discrimination in employment. *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997). Although Title VII, and therefore the FHA, allows plaintiffs to bring claims under both disparate treatment and disparate impact theories of liability, *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009), the plaintiffs here advance only disparate treatment claims, Comp. ¶ 20. An individual suffers disparate treatment "when he or she is singled out and treated less favorably than others similarly situated on account of [his or her disability]." *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir. 1988) (citations and

---

[3] Oregon's fair housing law, O.R.S. § 659A.145, mirrors the FHA and the two statutes are interpreted identically. *Marquard v. New Penn Financial, LLC*, No. 3:17–cv–549–SI, 2017 WL 4227685, at *12 (D. Or. Sept. 22, 2017) (citing *Fishing Rock Owners' Ass'n v. Roberts*, 6 F. Supp. 3d 1132, 1138 n.1 (D. Or. 2014)). The Court's resolution of Plaintiffs' FHA claims will therefore also decide the outcome of their state law claims.

quotation marks omitted). To prevail on a claim of disparate treatment, a plaintiff must show that she qualified for protection under the FHA, that the defendant engaged in conduct prohibited by the FHA, and that the defendant's prohibited conduct was motived by discriminatory intent. *See Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).[4]

A disparate treatment claim may be analyzed under either one of two different evidentiary frameworks. *McGinest v GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003)). The applicable framework depends on the type of evidence offered by the plaintiff. *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008). If a plaintiff presents indirect evidence of discrimination, courts generally employ the *McDonnell Douglas* burden-shifting framework, which, separate from the question of intent, first requires the plaintiff to establish a prima facie case of discrimination and then requires the defendant to rebut it with a non-discriminatory explanation. *Id.* If, however, a plaintiff presents direct evidence of discriminatory intent, she may proceed straight to the task of satisfying her burden of persuasion. *McGinest*, 360 F.3d at 1122. In both instances, the dispositive factual inquiry is always whether the defendant harbored a discriminatory motive. *Id.* Here, the *McDonnell Douglas* framework is inapplicable because, as described below, Plaintiffs rely on direct evidence of Defendants' discriminatory intent. The Court therefore addresses each element of Plaintiffs' disparate treatment claims in their logical order.[5]

---

[4] Defendants erroneously characterize Plaintiffs' suit as alleging a failure to provide reasonable accommodations as required by 42 U.S.C. § 3604(f)(3). Defs.' Br. 8. Under § 3604(f)(3)(B), "reasonable accommodations" must be made in "rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling." Defendants, however, have a policy of allowing tenants to keep dogs in their apartments. Defs.' Br. 8 ("[Defendants] have a long and undisputed history of allowing all kinds of animals . . . ."). As such, Plaintiffs never asked Defendants to *modify* any existing rule or policy; rather, they simply asked that Defendants apply an existing policy in a non-discriminatory manner. Their suit is therefore properly characterized as alleging disparate treatment under 42 U.S.C. § 3604(f)(1).

[5] Plaintiffs' brief addresses Defendants' Motion for Summary Judgment by walking through the *McDonnell Douglas* framework and then relying primarily on direct evidence to make their own case for summary judgment. While this was a prudent mode of analysis given the procedural posture of this case, the Court finds it unnecessary to separately

## I. Protection Under the Fair Housing Act.

Defendants first contend that Plaintiffs have not suffered a cognizable injury under the FHA. Defs.' Br. 7-8. They concede that Jo Sanders is disabled and that Sarah Sanders intended to apply for housing on behalf of Jo Sanders. Defs.' Br. 8. Nevertheless, Defendants argue that, because the alleged disparate treatment was based *solely* on Plaintiffs' status as dog owners, and the dog in question does not qualify as a service animal, Defendants' actions were, at most, based on an attribute unprotected by the FHA (i.e., traditional dog ownership). Defs.' Br. 8; Defs.' Reply Br. 4. This argument fails as a matter of law.

As applied to the facts of the present case, the FHA does not require Plaintiffs' dog to qualify as a service animal. To bring suit under the FHA, an individual need only allege that she has suffered a "distinct and palpable injury" stemming from a defendant's discriminatory conduct. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). It is well settled that, even if an individual is not disabled or only represents that she is disabled, the FHA nevertheless permits recovery if she suffers a pecuniary or other concrete harm. *See Harris*, 183 F.3d at 1050 (citations omitted). This Court, for example, has previously held that the FHA affords standing to "fair housing testers" who pose as prospective tenants with service animals, even though such individuals are neither disabled nor the owners of actual service animals. *Avakina ex rel. Fair Housing Council of Oregon v. Chandler Apartments*, No. 6:13-cv-1776-MC, 2015 WL 413813, at *3-5 (D. Or. Jan. 30, 2015). This liberal construction is consistent with the FHA's definition of "handicap," which includes individuals not only suffering from a qualifying impairment, but

---

analyze Defendants and Plaintiffs' motions. In particular, Defendants' motion is virtually unsupported by any legal authority and the Court's analysis of Plaintiffs' motion demonstrates the absence of any disputes of material fact, even when viewing the evidence in a light most favorable to Defendants.

Page 7 – OPINION AND ORDER

also those "regarded" as having a qualifying impairment.[6]  42 U.S.C. § 3602(h)(3).  Although U.S. Department of Housing and Urban Development ("HUD") guidance permits a landlord, contemporaneous with a plaintiff's application, to request documentation of a disability or disability-related need for a service animal, the burden is on the landlord to address any doubts with further inquiry.[7]  *See* FHEO Notice 2013-01 at 3.

Here, the record contains uncontroverted evidence that Defendants operated under the assumption that Plaintiffs owned a service animal.  Plaintiffs' housing application clearly represented that Jo Sanders owned a "VA registered service dog" and that it was "trained with documentation."  Ellis Decl., Ex. 11 at 4.  Defendants never asked Plaintiffs for any verification of this representation and their internal emails expressly refer to the dog as a "service animal."  Ellis Decl., Ex. 11 at 2.  Ironically, the emails even discuss "precautions" Defendants should take in communicating with Plaintiffs so as to avoid legal exposure under the FHA.  Ellis Decl., Ex. 11 at 2. Although Defendants vociferously contest whether Plaintiffs' dog fits the definition of a service animal, they never contest, nor present evidence, that they ever questioned Plaintiffs' representation that the dog was a service animal.  Indeed, to the contrary, they concede that "[t]he fact that the Sanders [sic] had a service animal was known at the time we made the offer to rent to them with the higher deposit."  Defs.' Br. 3.  Since the record contains uncontroverted evidence that Defendants "regarded" Plaintiffs' dog as a service animal, and Plaintiffs were forced to expend additional time and resources searching for alternative housing, their claims fall within the scope of federal and state fair housing law.

---

[6] Although the FHA uses the terms "handicap" and "handicapped," 42 U.S.C. § 3604(f), the Court uses the preferred terms "disability" and "disabled," unless referring to the statutory language.  *Cf. Helen D. v. DiDario*, 46 F.3d 325, 330 n.8 (3d Cir.1995) ("[I]ndividuals with disabilities find the term 'handicapped' objectionable.").  The Ninth Circuit treats the terms interchangeably.  *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1146 n.2 (9th Cir. 2003).

[7] HUD interpretations of the FHA are entitled to *Chevron* deference.  *Meyer v. Holley*, 537 U.S. 280, 287-88 (2003).

## II. Prohibited Conduct Under the Fair Housing Act.

Defendants next contend that their conduct was not prohibited by the FHA. Defs.' Br. 7-8. They advance two overlapping theories. First, Defendants argue that, because Plaintiffs never completed their housing application and eventually withdrew the partially completed application, it was never rejected and Plaintiffs were never denied housing. Defs.' Br. 4-5. Second, Defendants argue that Plaintiffs were actually offered the apartment, simply subject to "three conditions." Defs.' Br. 8. Although there is a genuine dispute of fact as to whether Defendants explicitly refused to rent Plaintiffs the apartment, the dispute is immaterial since, even if Defendants offered the apartment, their underlying conduct still violated the FHA.[8]

The FHA prohibits not only outright refusals to rent or sell a dwelling to disabled persons, but also every practice which has the "effect" of making it more difficult for disabled persons to obtain housing. *United States v. Youritan Constr. Co.*, 370 F. Supp. 643, 648 (N.D. Cal. 1973), *aff'd in relevant part*, 509 F.2d 623 (9th Cir. 1975). The use, for example, of "more burdensome" application procedures, "delaying tactics," and other "forms of discouragement" have the "effect" of making it more difficult to obtain housing and violate the FHA. *Corey v. U.S. Dep't of Housing and Urban Dev.*, 719 F.3d 322, 326 (4th Cir. 2013) (citing *Youritan Constr. Co.*, 370 F. Supp. at 648). The breadth of conduct prohibited by the FHA is confirmed by HUD regulations interpreting 42 U.S.C. § 3604(f)(1), the provisions of which specifically outlaw the imposition of "different rental charges," 24 C.F.R. § 100.60(b)(3)-(4), "different qualification criteria," *id.*, and "delay[s] [in] the processing of an application," 24 C.F.R. §

---

[8] The Court agrees with Plaintiffs that the balance of evidence weighs heavily in favor of its position that Defendants, at the very least, constructively denied Plaintiffs' application and that Plaintiffs did not voluntarily withdraw from consideration. That fact notwithstanding, when considering whether to grant summary judgment for Plaintiffs, it is not the Court's role to "weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the Court must view the evidence in a light most favorable to Defendants (i.e., the non-movants) and determine whether there is a genuine issue for trial. *Id.* Since there is at least some admissible evidence in the record that Defendants never rejected Plaintiffs' application, the Court proceeds on the assumption that Plaintiffs voluntarily withdrew their application without a formal rejection.

Page 9 – OPINION AND ORDER

100.70(d)(4). As noted above, the agency's interpretation of the FHA commands considerable deference. *Meyer*, 537 U.S. at 287-88.

Here, the evidence can only support the conclusion that Defendants otherwise made the listed apartment unavailable to Plaintiffs. Although there is a genuine dispute of fact as to whether Defendants explicitly decided and communicated to Plaintiffs that their housing application was or would be rejected, *compare* Sanders Dep. 158:1-160:7 *with* Suckow Decl. 2 *and* Seidl Decl. 2, Defendants admit that they imposed certain "conditions" on their offer to Plaintiffs, Defs.' Br. 8. These conditions, which included an inflated deposit and refusing to replace carpet described by Defendants' employee as "FILTHY, NASTY, . . . PUKE," had the effect of making it harder for Plaintiffs to obtain housing. Ellis Decl., Ex. 8 at 1 (capitalization in original). Astonishingly, and as if to leave no doubt as to the purpose of these conditions, Mr. Seidl even sent an email to Ms. Suckow stating that he wanted to "make it difficult" for Plaintiffs and instructing her not to return their phone calls. Ellis Decl., Ex. 11 at 2. Setting aside the question of motive, which the Court addresses below, Defendants' proffered version of events is a hornbook example of conduct prohibited by the FHA.[9] The issue of whether Defendants formally denied Plaintiffs' application is therefore immaterial and Defendants' self-described conduct falls comfortably within the scope of 42 U.S.C. § 3604(f)(1).

### III. <u>Discriminatory Intent Under the Fair Housing Act</u>.

Defendants lastly contend that their conduct was not motivated in whole or in part by discriminatory intent. Defs.' Br. 8. Without citing any legal authority or contrary evidence, Defendants flatly deny any improper motive and argue that the conditions placed on their offer were based solely on Plaintiffs' "barely qualifying" income. Suckow Decl. 2; Defs.' Reply Br.

---

[9] Their conduct also likely runs afoul of 42 U.S.C. § 3604(f)(2), which prohibits "discrimat[ion] in the terms, conditions, or privileges of sale or rental," but Plaintiffs do not assert this claim. *See* Compl. ¶¶ 19-21.

Page 10 – OPINION AND ORDER

4. Defendants' arguments are, once again, unpersuasive and, even when the evidence is viewed in a light most favorable to them, fail to raise a genuine issue for trial.

Under the FHA, a plaintiff alleging disparate treatment must demonstrate that a defendant's conduct was motived by discriminatory intent. *Gamble*, 104 F.3d at 305. As noted above, a plaintiff merely seeking to avoid summary judgment may produce indirect evidence of discrimination and benefit from the *McDonnell Douglas* framework, but she is not obligated to do so and may instead "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the challenged decision."[10] *Budnick*, 518 F.3d at 1114 (citations and quotation marks omitted). Although a defendant's challenged conduct need only be motivated in part by discriminatory intent, mixed-motive decisions offer defendants an additional opportunity to avoid liability. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 242-47 (1989). In particular, once a plaintiff shows that the challenged conduct was motivated by an unlawful consideration, a defendant may assume the burden of persuasion and avoid liability if she can prove that she would have taken the same actions even absent the unlawful consideration. *Id.*; *cf. Desert Palace, Inc., v. Costa*, 539 U.S. 90, 93 (2003) (describing the assertion of mixed motives as an affirmative defense distinct from a pretext analysis).

Here, Plaintiffs produce incontrovertible direct evidence that Defendants were motivated by discriminatory intent. In particular, Mr. Seidl flatly admitted that Defendants would only offer the apartment with the puke-stained carpet and an inflated deposit "since [Jo Sanders] has a large service animal." Ellis Decl., Ex. 11 at 2. This admission, moreover, is just one part of a longer, unguarded exchange with Ms. Suckow about Defendants' general aversion to allowing a "large" service dog onto new carpet, their "plan" to falsely represent that they would never "deny

---

[10] Direct evidence is that which "proves a particular fact in question without reliance upon inference or presumption." *Randle v. La Salle Telecomms. Inc.*, 876 F.2d 563, 569 (7th Cir. 1989).

[Plaintiffs'] application because [of their] dog," and, oddly, repeated instructions for Ms. Suckow to explicitly tell Plaintiffs that the lease conditions were *because* "the owner doesn't want to replace [the carpet] and then put an animal on it." Ellis Decl., Ex. 11 at 1-4. Although Defendants deny any discriminatory intent, such "self-serving testimony" cannot rebut their unambiguous admissions of motive. *Villiarimo*, 281 F.3d at 1061.

To the extent Defendants argue that, regardless of any discriminatory motive, Plaintiffs' income was the *dispositive* consideration—an extremely generous interpretation of their position given that they never use the phrase "mixed motive" or cite any relevant legal authority—no rational trier of fact could find that Defendants have established, by a preponderance of the evidence, that their actions would have been the same absent the unlawful consideration. The Court acknowledges that, on one occasion, Mr. Seidl expressed concern that Plaintiffs' income was "tight." Ellis Decl., Ex. 11 at 4. However, he later noted that the income met Defendants' minimum requirements, Ellis Decl., Ex. 11 at 2, and, shortly thereafter, Defendants rented the apartment to a non-dog-owning individual with a *lower* income, Seidl Dep. 66:1-22.[11] When Plaintiffs re-inquired after giving away their dog, moreover, Mr. Seidl refused to even answer the inquiry, stating that "[t]hey'll just move the dog in later and we won't be able to stop them." Ellis Decl., Ex. 11 at 4. The statement—which makes no mention of income—leaves no doubt that, even once Plaintiffs no longer owned a dog, Defendants' focus was exclusively on the issue

---

[11] Defendants' representation that the eventual tenant, Ms. Bay, was a dog owner is simply false. The record shows that when Ms. Bay applied for and was leased the apartment, she owned no dogs and had no plans to get a dog. Ellis Decl., Ex. 13 at 1; Suckow Dep 73:3-74:11. Instead, three months *after* signing her lease, Ms. Bay signed a separate Pet Agreement so that her brother, who visited "on [an] occasional basis," could bring his dog. Ellis Decl., Ex. 13 at 2. This is quite different from Defendants' representation that Ms. Bay "had a dog." Seidl Decl. 2.

Page 12 – OPINION AND ORDER

of dog ownership. Taken together, no rational trier of fact could conclude that Defendants' actions were primarily motivated by anything other than discriminatory intent.[12]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is GRANTED. Defendants' Motion for Summary Judgment is DENIED. The issue of damages remains. The current trial date is vacated and the parties are instructed to submit a Joint Status Report describing settlement possibilities, if any, and, as necessary, proposed trial dates by March 2, 2018.

IT IS SO ORDERED.

DATED this 16th day of February, 2018

/s/ Michael McShane
Michael J. McShane
United States District Judge

---

[12] Moreover, even if Plaintiffs' income could explain Defendants' decision to require an inflated deposit, there is no rational connection between their income and the refusal to replace the carpet. Indeed, despite her lower income, Defendants admit that they provided Ms. Bay with new carpet. Suckow Dep. 38:18-23.

Page 13 – OPINION AND ORDER